In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-21-00047-CV**
**IN THE INTEREST OF H.M.W., A CHILD**

**On Appeal from the 414th District Court**
**McLennan County, Texas**
**Trial Cause No. 2018-2187-5**

**MEMORANDUM OPINION**

This is an appeal of a SAPCR (Suit Affecting Parent Child Relationship). After a bench trial, Appellant "Ariana"[1] appeals the trial court's Order appointing Konnor (Father) and Ariana (Mother) as joint managing conservators of H.M.W. (Heather), granting Konnor the right to designate Heather's primary residence and to make educational decisions, granting Ariana "standard visitation" with Heather,

---

[1] We use pseudonyms herein to refer to the child and her parents. *See* Tex. R. App. P. 9.8(b)(2).

ordering Ariana to pay child support of $200 per month, and requiring Konnor to maintain health insurance for Heather.[2] We affirm the trial court's judgment.

## Background

Konnor filed an Original Petition in Suit Affecting the Parent-Child Relationship and to Establish Paternity ("Petition") in June 2018. The Petition named Heather, a nineteen-month-old child, as the subject of the suit and Ariana as the child's mother. Konnor sued to establish parentage, for conservatorship and possession of Heather, and for child support. In the Petition, Konnor alleged that Ariana had a history of threatening violence. Ariana countersued for conservatorship and possession of Heather and for child support. The trial court signed Temporary Orders, appointing Konnor and Ariana as Temporary Joint Managing Conservators of Heather and ordering Konnor to pay Ariana $125 per month for child support. The case was tried to the bench. At the time of trial, Heather was almost four years old.

## Evidence at Trial

### Testimony of Dodie

Dodie testified that she is Konnor's mother. She testified that she learned that Ariana was pregnant in July 2016 when Ariana contacted her on Facebook asking

---

[2] Pursuant to an order issued by the Supreme Court of Texas, this case was transferred to our Court from the Tenth Court of Appeals in Waco, Texas. *See* Tex. Gov't Code Ann. § 73.001.

for about $2500 for an abortion. At the time, Dodie did not know Ariana. According to Dodie, Ariana told her she was five months pregnant, and she told Dodie the only prenatal care she had received was in an initial visit with a gynecologist when she learned she was pregnant. Dodie testified that the day after Heather was born, Ariana sent her a Facebook message saying she wanted to put the baby up for adoption. When Dodie replied she did not want Ariana to do that, Ariana asked if Dodie wanted the child. In response, Ariana asked Dodie if she wanted to take the child home from the hospital. Dodie testified that she and Konnor took Heather home from the hospital, and the hospital paperwork showed Heather weighed four pounds at birth, Heather had a collapsed lung, Heather had an infection in her bloodstream, and Heather was in the NICU for about eleven days. According to Dodie, when Konnor saw Heather in the hospital, Ariana decided she wanted to keep her baby.

Dodie also testified about Konnor's background and qualifications to support Heather. According to Dodie, Konnor had served in the military, but he left the service about two years before the trial. She also testified that since Heather's birth, Konnor has been covering Heather as an additional insured on his health insurance policy. Dodie recalled that prior to trial, Ariana had asked Konnor for money, about $6000 in lieu of going to trial. And Dodie explained that while she and Konnor arranged for Heather to get vaccinations, Ariana told Konnor she did not believe in vaccinations and told Dodie that she did not like them because "it upset the baby[]"

3

and "they made her cry." According to Dodie, Konnor deployed about four months after Heather's birth, and upon his return about eight months later, Ariana would not allow Konnor and Dodie to take Heather. Dodie testified that while Konnor was deployed, she kept Heather a week or two every month. Dodie said she maintained a list of the times she kept Heather.[3] After Konnor returned from his deployment, Ariana refused to allow him to see Heather, and she complained that Konnor "wasn't gonna be a good dad." Dodie also testified that when Heather was about a year-and-a-half old, Ariana told Dodie she wanted to move to Greece with an ex-boyfriend and she wanted to take the baby.

Dodie testified that Ariana told her she had been hospitalized three times: December 2016, and in January and March 2017. The first time was shortly after Heather was born, Ariana had lupus, and her blood count was low. According to Dodie, Ariana has another child who lives with Ariana's parents. Dodie testified that Ariana had told her she did not have money to purchase things for Heather or for gasoline, and Dodie agreed she and Konnor "had difficulty with [Ariana] not being quite accurate…about the cost of things[.]" According to Dodie, after the court signed temporary orders establishing visitation, Ariana was either late or did not show up seventeen times, and "there was trouble with every pickup." On one

---

[3] Dodie's notes reflected that she kept Heather in 2017, as follows: February 27 to March 8; April 28 to May 8; May 31 to June 19; August 14 to August 29, September 25 to October 13; and November 29 to December 12.

4

occasion, Ariana told Konnor to pick up Heather at her house instead of where they usually met, and when Konnor went to Ariana's house to get Heather, Ariana called the police and told police to remove Konnor from her property. According to Dodie, Ariana does not have "an even keel of personality[]" and Ariana sometimes changes her mind. On cross-examination, Dodie agreed that Ariana "seems to be a good mom[,]" but that Ariana's mother "takes care of [Heather] more[]" than Ariana does. Copies of Dodie's Facebook messages with Ariana were admitted into evidence.[4]

Testimony of Ariana

Ariana agreed she had Heather when Konnor was in the military. She also agreed that she did not have any prenatal care and she did not know she was pregnant until she was about five months along. She agreed she told Konnor she wanted to get an abortion and she asked for money for the procedure. She also testified that she took "Plan B" twice to cause a spontaneous abortion.

---

[4] The Facebook messages between Ariana and Dodie cover dates between June 16, 2016 and July 27, 2017. In messages dated June 16, 2016, Ariana asked Dodie for help and stated that she wanted to "get rid of it [because] it's a baby with the wrong person[.]" In a June 30, 2016 message, Ariana gave a quoted price for an abortion and stated, "I can go out of state if that's cheaper" but also stated, "I'm trying to give her up in adoption." On November 16, 2016, Ariana stated that the baby was in the NICU and asked, "Do you want her?" and stated, "if y'all would like to pick her name that would be great[.]" On November 21, 2016, Ariana wrote "I can't give her up now, I actually want [Konnor] to sign over his rights[.]" Later messages include updates about the baby and photographs.

Ariana testified that Heather was in the hospital in the NICU for eleven days when she was born, and Heather had low birth weight and a collapsed lung. She agreed that Heather was in the NICU due to a collapsed lung and "because it was a syphilis complicated delivery[.]" Ariana also testified that she was hospitalized three times around the time Heather was born for lupus and anemia. She agreed she told Dodie that she was not going to immunize Heather because "[w]hat mother likes to see their kid get poked with a needle?"

Ariana also agreed that she told Konnor she wanted to put Heather up for adoption, and another time she told Konnor she wanted to go to Greece with her "ex" and take Heather. She agreed she told Konnor to sign something so she could move to Greece with her boyfriend, and she was angry with Konnor because "he wasn't getting the birth certificate quite fast enough[,]" and the birth certificate was necessary to get a passport for Heather.

Ariana agreed that while Konnor was deployed, Dodie kept Heather for about seventy-six days. Ariana agreed that, after Konnor returned from his deployment, she would not allow him to see Heather until a court order required her to do so in March 2018. She testified she did that because she did not think he was being honest with her about having his girlfriend around Heather. Ariana agreed she called the police on Konnor once or twice and that on one occasion, told the police Konnor was getting aggressive with her. Ariana denied ever pointing a gun at Konnor, but

she agreed that during one confrontation, she had her brother's gun and joked about shooting Konnor.

Ariana agreed it sounded "about right[]" that she had either been late or did not show up seventeen times when she and Konnor were scheduled to transfer Heather. Ariana testified that at one point, she told Konnor she was not going to meet him any more even though there was court-ordered visitation because she was tired and frustrated, she "didn't want to do this anymore[,]" and it was hard on Heather. She agreed she was "fairly consistently late" in picking up or dropping off Heather until her parents started making the exchange. According to Ariana, Konnor failed to pay support in a consistent manner, but she agreed that at the time of trial, Konnor was current on his child support and he had always maintained health insurance on Heather. Ariana also agreed Konnor was "a good dad[.]" Ariana was not sure where Konnor lived, but she agreed he lived in the greater Houston area and they met near Rosharon to exchange Heather.

Ariana testified that she has another child who was ten years old at the time of trial and her children live with her parents. At the time of trial, Ariana had been working at FedEx for two years where she worked twenty-five to forty hours a week for $15 an hour.

Ariana testified that she should be the one to determine Heather's residence because "it's very clear and I have demonstrated how I'm very more stable. I can

7

give my child more stability and I would like to raise her in a more religious home." She testified that she had gotten educational materials for Heather because Heather wanted to do homework like her older sister. She also testified that Heather spoke both English and Spanish. Ariana also hoped to take her girls to ballet and piano lessons.

Testimony of Konnor

Konnor testified that he met Ariana in 2015 or 2016 through a dating app while he was deployed in Kuwait, and they dated for a few weeks in 2016 when he returned from his deployment. He recalled learning that Ariana was expecting when she was five or six months pregnant, which was after Ariana had notified his mother about the pregnancy. Ariana told him she did not want the baby, they talked about an abortion, and Ariana told him she was "taking pills to get rid of it." Konnor testified that while they discussed marriage, he told Ariana "it's just not going to happen[]" and he had concerns about how she acted, things she asked for, and he knew "something wasn't right." Konnor testified that Ariana asked him for money before Heather was born, and Ariana asked him to buy her a car after Heather was born.

Konnor agreed he went to the hospital when Heather was born, he took a paternity test, and Ariana texted him that he was to pick the baby up at the hospital. According to Konnor, Ariana wanted him to pick the baby up because he understood

8

that "she didn't want the baby at that point[]" and he named the baby. Konnor testified that he kept Heather about three weeks after he picked her up from the hospital and during that time, Ariana did not call but she texted. Konnor recalled that after Heather was born, Ariana was "in the psyche ward[]" for a while.

Konnor agreed that his mother kept Heather for "significant periods of time[]" while he was deployed, but that when he returned from deployment, Ariana would not let him see Heather because Ariana told him she "[didn't] know what [he] went through on deployment and that changed [him]." Konnor testified that he had maintained health insurance for Heather and had given Ariana information about the policy. According to Konnor, after Ariana complained about the copay required, he "upgraded" to coverage with a lower copay. Konnor testified that after he was ordered to pay child support, there was an issue with the billing, and a payment did not go through, and he did not recall that he was late on payments and stated that sometimes he paid in advance. He also testified that he had taken Heather for shots. Ariana did not take her for shots because she did not like to see Heather get hurt and her family did not believe in shots. According to Konnor, Ariana had never asked for Heather's shot records.

Konnor testified that after the court-ordered visitations began, Ariana failed to show up "anywhere from 8 to 15 days[,]" and she was late every time without explanation. Konnor agreed that he had trouble with Ariana not living up to the

visitation agreement. Konnor testified that when he went to pick up Heather, Ariana and her mother would hold Heather and not hand her off, which made Heather cry. At one point, Konnor had to get a police officer to tell Ariana and her mother to hand over Heather. Konnor testified that when he picked Heather up, he saw Ariana and her mother speak to Heather in a way that "seem[ed] to upset" Heather.

According to Konnor, Ariana had called the police on him and on his babysitter. Ariana told him she did not trust babysitters and that if he needed a babysitter, Ariana's mother could watch the baby. Konnor testified that one time Ariana called to tell him Heather needed to go to the doctor because she had a cold, and Ariana "couldn't make the drive and she didn't have the money[,]" so Konnor went to pick up Heather and when he went inside to get her, Ariana "brought out the AR-15." Konnor recalled that he said the weapon looked brand new, and Ariana told him he "was going to be the first target." After Ariana got into his truck, he recorded her while she talked about why Konnor could not have a relationship and how it was his fault they were not together. According to Konnor, he was not able to get Ariana out of his truck, he called his mother when he stopped, and his mother called the police. Konnor testified that he played the recording for the police, and he was not arrested.

Konnor testified that at the time of trial, he had been working for a chemical plant as a process operator for two years, and he made $33 an hour. He also testified

10

that the job carried the potential for a four-year pay increase and other options after he reached the top pay. He testified that he lived in a three-bedroom, 1700-square-foot house with his girlfriend, and the home is five minutes from an elementary school and a middle school was close by. Konnor explained that his work shift schedule allowed him to get seven days off in a row every other week, which was "nice[]" when he had Heather with him. According to Konnor, his boss had agreed that he could work "days four days a week" if the court agreed he could establish primary residency of Heather. Konnor testified that he had $7500 in a savings account for Heather, which he had saved over a two-year period. Konnor stated that his mother lives in Louisiana, but she visited about once a month, and she had occasionally picked up Heather for him. According to Konnor, when he had Heather, they would go to the park or to a movie, or they would play on the trampoline or swing set in the back yard, and he had taught Heather to ride a bicycle without training wheels. Konnor testified that he did not want any child support from Ariana if the court left Heather with him.

Testimony of Karla

Karla testified that she was Konnor's girlfriend and she had lived with him for a year. She testified that she worked as a freelance graphic designer and yoga instructor. Karla told the court that she adored Heather, and she would "love it[]" if Heather could live with them full time. According to Karla, when she and Konnor

had Heather, they went to the playground, did arts and crafts, and played teacher or princess.

After the trial, the court entered an order appointing Konnor and Ariana as joint managing conservators; granting Konnor the right to designate Heather's primary residence and to make educational decisions; granting Ariana "standard visitation" with the child; ordering Ariana to pay child support of $200 per month; and requiring Konnor to maintain health insurance for Heather.

The trial court entered the following Findings of Fact and Conclusions of Law after a request from Ariana:

FINDINGS OF FACT

1. The child the subject of this suit is [Heather], a female child born November 15, 2016, in Waco, Texas.
2. The mother of the child is [Ariana].
3. The father of the child is [Konnor].
4. The child was born in Waco, McLennan County, Texas.
5. At the time of the child's birth, [Konnor] was stationed at Ft. Hood, Texas, with the U.S. Army.
6. At the time of the child's birth, [Ariana] lived in McLennan County with her parents and child by a previous relationship.
7. The mother of the child considered both an abortion and placing the child for adoption prior to the child's birth.
8. The mother of the child contacted [Konnor] regarding her pregnancy for the first time in July of 2016.
9. [Ariana] did not receive any prenatal care during her pregnancy.
10. Right after the child's birth, [Ariana] asked [Konnor] to sign documents to place the child for adoption and he refused.
11. The child was placed in the Neo Natal Intensive Care Unit at birth (NICU).
12. A paternity test was performed.

13. [Konnor] was shown to be the biological father of the child by that test.

14. [Ariana] did not dispute his paternity of the child.

15. [Ariana] and [Konnor] were never married and never lived together.

16. The relationship between [Ariana] and [Konnor] lasted a very short period of time.

17. [Ariana] allowed [Konnor] to rename the child.

18. The child remained in the NICU after the mother was discharged from the hospital.

19. The child was taken home from the hospital by [Konnor] on November 27[], 2016.

20. The child was kept by [Konnor] from November 27, 2016, until December 4, 2016, at which time she was returned to her mother.

21. The child was again kept by the father on December 5, 2016, until January 8, 2017, when she was returned to her mother's parents.

22. [Ariana] was hospitalized in January, 2017.

23. The child was kept by the father from January 14, 2017, until January 18, 2017.

24. The child was again kept by the father from January 22, 2017, until January 28, 2017.

25. The child was kept by the father from February 3 until February 6, 2017.

26. [Konnor] had possession of the child on February 23, 2017, and continued possession until he was deployed overseas with the United States Army on February 27, 2017.

27. The child was in the possession of the paternal grandmother April 28 to May 8, 2017, from May 31 to June 19, 2017, August 14 to August 29, 2017, and September 25 to October 13, 2017.

28. The mother was hospitalized again in March, 2017.

29. Sometime after the birth of the child, [Ariana] informed [Konnor] that she needed him to sign documents for the child to have a passport so she could move to Greece with an ex-boyfriend.

18. [Konnor] returned from deployment in November, 2017, at which time [Ariana] kept the child from him for periods of time.

19. After the temporary hearing in March, 2018, the parents shared the child equally on a week by week basis.

20. [Konnor] exited the U.S. Army and moved to Brazoria County, Texas.

21. Since his move to Brazoria County, [Konnor] has a stable job with insurance for the child and advancement with increases in pay.

22. During the pendency of this case [Ariana] has worked at a day care center, a bank and currently works at FedEx.

23. [Ariana] continues to live with her parents and older child in McLennan County.

24. [Ariana] violated the temporary orders for possession of the child and was caused to provide make up times to [Konnor].

25. [Konnor] lives with [Karla] who works from home and is available to assist with care of the child.

26. [Konnor] lives near a school.

27. Both parents have adequate funds to support the child.

28. [Konnor] currently covers the child with health insurance.

29. [Ariana] should pay child support for the child in the amount of $200.00 per month.

## CONCLUSIONS OF LAW

1. [Konnor] and [Ariana] are the parents of one child, [Heather], a female child born November 15, 2016, who is the subject of this suit.

2. The court has jurisdiction over this case and of all parties.

3. No other court has continuing, exclusive jurisdiction of this case.

4. It is in the best interest of the child that [Konnor] and [Ariana], be appointed Joint Managing Conservators of the child.

5. It is in the best interest of the child that [Konnor] have the exclusive right to designate the primary residence of the child within Brazoria County, McLennan County or counties contiguous thereto.

6. It is in the best interest of the child that [Konnor] have the exclusive right to receive and give receipt for child support.

7. It is in the best interest of the child that [Konnor] have the exclusive right to make decisions concerning the child's education.

8. It is in the best interest of the child that each parent have the right to apply for a passport for the child, to renew the child's passport and to maintain possession of the child's passport subject to the agreement of the other conservator.

9. It is in the best interest of the child that all other rights, powers and duties of a parent should be exercised by the joint managing conservators independently.

10. It is in the best interest of the child that [Ariana] have possession of the child at all times as the parties may mutually agree and failing mutual agreement according to the Standard Possession Order with the expand[ed] possession times if the parents live 100 miles or less from

14

each other, and the non-expanded times if the parents reside more than 100 miles from each other.

11. It is in the best interest of the child that [Konnor] have possession of the child at all other times not specifically designated for [Ariana].

12. It is in the best interest of the child that [Ariana] pay child support to [Konnor] in the amount of $200.00 per month beginning November 1, 2020, which is less than the amount the Texas Child Support Guidelines would mandate.

13. It is in the best interest of the child that any employer of [Ariana] withhold the child support payments from her disposable earnings.

14. It is in the best interest of the child that [Konnor] maintain health and dental coverage for the child through his employment and that the reasonable and necessary health-care expenses of the child that are not reimbursed by health insurance or dental insurance shall be paid 50% by [Ariana] and 50% by [Konnor].

## Issues

Appellant raises three issues on appeal. In her first issue, Appellant argues that the trial court abused its discretion in granting Konnor the exclusive right to designate the child's primary residence and granting Ariana the rights of a possessory conservator under the standard possession order. In her second issue, Appellant argues that the trial court abused its discretion by granting Konnor the exclusive right to make educational decisions. And in her third issue, Appellant argues that the trial court abused its discretion by requiring Ariana to pay child support when Konnor judicially admitted that child support should not be ordered.

## Standard of Review

The trial court's final order states "On October 31, 2019, November 21, 2019, September 28, 2020 and October 26, 2020 the Court heard this case." When

15

requesting the reporter's record for this appeal, Appellant requested records from proceedings on October 31, 2019 and October 26, 2020. Appellant's brief states that "[t]he court conducted the final hearing in two hearings held about 12 months apart." Our appellate record does not include reporter's records from November 2019 or September 2020, and Appellant's request for the reporter's record did not include a statement of the points or issues to be presented on appeal. *See* Tex. R. App. P. 34.6(c)(1). Therefore, we presume that the missing portions of the record are relevant and support the trial court's judgment. *See* Tex. R. App. P. 34.6(c)(4); *Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 377 (Tex. 2001); *Lehman v. Lehman*, No. 03-19-00730-CV, 2021 Tex. App. LEXIS 615, at **6-10 (Tex. App.—Austin Jan. 27, 2021, pet. denied) (mem. op.); *Ward v. Baylor Univ.*, No. 10-11-00066-CV, 2012 Tex. App. LEXIS 1437, at **1-2 (Tex. App.—Waco Feb. 22, 2012, pet. denied) (mem. op.).

We review the trial court's decisions on possession of a child for an abuse of discretion. *K.T. v. M.T.*, No. 02-14-00044-CV, 2015 Tex. App. LEXIS 8558, at *8 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court

16

would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). There is no abuse of discretion when the trial court decides based on conflicting evidence, so long as some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

In the context of this case, legal and factual sufficiency are not independent of each other, but they are relevant factors in deciding whether the trial court abused its discretion. *K.T.*, 2015 Tex. App. LEXIS 8558, at *8. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information upon which to exercise its discretion and then whether it erred in its application of that discretion. *Id*. The traditional sufficiency review is involved in answering the first question and whether the trial court made a reasonable decision is involved when answering the second question. *Id*.

The trial court is in a better position than the appellate court to decide factual issues in custody cases because it observed the demeanor of the parties and the witnesses and had the opportunity to evaluate each conservator's claims. *Id*. at *14. We defer to the trial court's resolution of underlying facts and to its credibility

determinations. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Most orders arising from a suit affecting the parent-child relationship will not be disturbed on appeal unless the complaining party can demonstrate a clear abuse of discretion." *In re J.R.P.*, 526 S.W.3d 770, 777 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

The trial court entered findings of fact and conclusions of law. In a case tried without a jury, the trial court's findings of fact have the same dignity and force as a jury's verdict upon special issues. *Seidel v. Seidel*, 10 S.W.3d 365, 368 (Tex. App.—Dallas 1999, no pet.). The trial court, as trier of fact, evaluates the witnesses, assigns the weight to be given their testimony, and resolves any conflicts or inconsistencies in the testimony. *Young v. Young*, 168 S.W.3d 276, 281 (Tex. App.—Dallas 2005, no pet.); *Smith v. Vankirk*, 314 S.W.2d 377, 379-80 (Tex. App.—Waco 1958, writ ref'd n.r.e.).

In determining issues of conservatorship and possession of and access to a child, the best interest of the child is the trial court's primary concern. Tex. Fam. Code Ann. § 153.002. In determining what is in the child's best interest, a trial court may look to the non-exhaustive list of factors promulgated by *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). These factors include: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the

18

individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See id.* at 371-72. Other concerns include the need for stability for the child and the need to prevent constant litigation of child custody. *See In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).

Right to Designate the Child's Primary Residence

Appellant argues that the trial court erred in granting Konnor the exclusive right to designate Heather's primary residence and granting Ariana possessory conservator rights under the standard possession order. According to Appellant, the evidence relevant to the *Holley* factors establishes that it is in Heather's best interest for Ariana to designate her primary residence and exercise the rights of managing conservator under the standard possession order. In addition, Appellant argues that several of the trial court's findings are contrary to the evidence, and Appellant specifically challenges the findings that she failed to receive prenatal care during her pregnancy, that she allowed Konnor to rename the child, that Konnor kept the child from December 5, 2016 until January 8, 2017, when Heather was returned to

Ariana's parents, and that Ariana kept Heather from Konnor for periods of time after Konnor returned from deployment.

In determining which conservator will have exclusive right to establish the primary residence under section 153.134(b), the trial court is vested with broad discretion. *See In re K.L.W.*, 301 S.W.3d 423, 428 (Tex. App.—Dallas 2009, no pet.). At trial, the following exchange occurred when Ariana testified:

> Q. [Counsel for Konnor]: Is it true that you did not have any prenatal care?
> A. [Ariana]: That is true.

Therefore, we cannot say the trial court's findings of fact that Ariana did not receive prenatal care is unsupported by the evidence.

As to naming the child, Appellant argues that she established as a matter of law that she and Konnor chose Heather's name together. During direct examination of Konnor, the following exchange occurred:

> Q. [Counsel for Konnor]: Were you allowed to make the baby's -- give the baby the name?
> A. [Konnor]: Yes.

Ariana also testified as follows on cross-examination:

> Q. [Counsel for Konnor]: You let [Konnor] name this child, is that correct?
> A. [Ariana]: Well, we agreed on a name together.

As factfinder and sole judge of the credibility and weight of the witnesses' testimony, the court could have believed Konnor and disbelieved Ariana. *See Young*, 168 S.W.3d at 281; *Smith*, 314 S.W.2d at 379-80.

20

Appellant argues that the evidence establishes as a matter of law that Ariana allowed Konnor to keep Heather from December 15, 2016 "only until January 4, 2017." Ariana testified that Konnor "[p]robably[]" had Heather from December 15, 2016 until January 8, 2017. Ariana also testified that she was in the hospital on January 8, 2017 for "about a week, if not a little bit longer than a week." Dodie testified that it "[s]ound[ed] correct[]" that she and Konnor had Heather from December 15, 2016 until January 4, 2017. We assume that the trial court, as factfinder, resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *See In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009). Therefore, we cannot say that the trial court's finding that Konnor kept Heather from December 15, 2016 until January 8, 2017 lacks support in the record or that the trial court abused its discretion.

Appellant also argues that Dodie testified that Heather stayed with Konnor for two weeks after he returned from deployment. According to Appellant, this evidence established as a matter of law that Ariana did not withhold Heather from Konnor after he returned from deployment.

There is also evidence in the record from Konnor's testimony that when he returned from deployment, Ariana would not let him see Heather because Ariana "[didn't] know what [he] went through on deployment and that changed [him]." The trial court entered temporary orders for visitation in April 2018, and Dodie testified

that after the court entered these orders, Ariana was late or did not show up seventeen times and "there was trouble with every pickup." During Dodie's testimony, the following exchange occurred:

> A. [Dodie]: We had -- once [Konnor] got home, she let us take her -- when he first got home, 11-29 to 12-12. But that was probably a week after he got home.
> Q. [Counsel for Konnor]: Alright. From that point on, did she refuse visitation?
> A. [Dodie]: Yes.

Ariana testified that it sounded "about right[]" that she had either been late or did not show up seventeen times when she and Konnor were scheduled to transfer Heather for visitations. She also testified that at one point, she told Konnor she was not going to meet him any more despite a court-ordered visitation schedule because she was tired and frustrated, she "didn't want to do this anymore[,]" and it was hard on Heather.

Because we defer to the trial court's assessment of the evidence and we resolve disputed matters in favor of the trial court's findings, we conclude that the trial court's findings were supported by the evidence and the trial court did not abuse its discretion. *See J.O.A.*, 283 S.W.3d at 344-45; *Young*, 168 S.W.3d at 281; *Smith*, 314 S.W.2d at 379-80.

Appellant also argues that applying the *Holley* factors, the following conclusions of law are contrary to the evidence:

22

5. It is in the best interest of the child that [Konnor] have the exclusive right to designate the primary residence of the child within Brazoria County, McLennan County or counties contiguous thereto.

. . . .

10. It is in the best interest of the child that [Ariana] have possession of the child at all times as the parties may mutually agree and failing mutual agreement according to the Standard Possession Order with the expand[ed] possession times if the parents live 100 miles or less from each other, and the non-expanded times if the parents reside more than 100 miles from each other.

According to Appellant, the evidence establishes that she met Heather's emotional needs, Heather was developmentally on track, and Heather preferred to be with Ariana. Appellant concedes that her reluctance to take Heather for shots may be a shortcoming, but that Konnor relied on his mother, his sisters, and his girlfriend to parent Heather.

Appellee argues that he has maintained insurance coverage for Heather, he has paid child support, he has never missed a visitation, he supports himself with no assistance, and he has a job with potential. Appellee also argues that Ariana has often put her own interests above those of Heather. Ariana initially wanted an abortion, she had no prenatal care, she did not take Heather for inoculations, and she expressed the wish to move to Greece with a boyfriend and take Heather with her. Appellee also argues that Ariana is not financially self-sufficient, despite having had numerous jobs since Heather's birth. Ariana admitted that she was late or failed to show for about seventeen visitations.

On this record, we cannot say the trial court abused its discretion. We overrule Appellant's first issue.

Right to Make Educational Decisions

In her second issue, Appellant argues that the trial court abused its discretion in granting Konnor the exclusive right to make educational decisions and the court's findings and conclusions are unsupported by the evidence. Appellant argues that she regularly engages with Heather in learning activities, and that Konnor does not know anything about his school district.

Ariana testified that she had gotten educational materials for Heather because Heather wanted to do homework like her older sister, Heather spoke both English and Spanish, and Ariana also hoped to take Heather to ballet and piano lessons. Konnor testified that his house was five minutes from an elementary school and a middle school was close by. Konnor's girlfriend testified that when Heather stayed with them, they played with arts and crafts, numbers, and books, and that Heather liked to "play like teacher[.]" The evidence reflects that Ariana and Konnor had difficulty managing visitation. When the evidence shows that the parents cannot co-parent effectively, the trial court is justified in selecting one parent as exclusive decision-maker for educational purposes to avoid conflict. *See, e.g.*, *Coburn v. Moreland*, 433 S.W.3d 809, 828 (Tex. App.—Austin 2014, no pet.). In addition, geographic distance between parents may make joint decision-making impractical.

*See Doyle v. Doyle*, 955 S.W.2d 478, 481 (Tex. App.—Austin 1997, no pet.). On this record, we cannot say the trial court's findings are unsupported by the evidence or that the conclusions are unsupported by law, and we cannot say that the trial court abused its discretion. We overrule Appellant's second issue.

Child Support

Appellant argues that the trial court abused its discretion by requiring Ariana to pay child support because Konnor testified under oath that he did not want child support. According to Appellant, Konnor's statement was "a binding judicial admission that precludes him from recovering child support."

We review a child support award for abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *In re J.D.M.*, 221 S.W.3d 740, 742 (Tex. App.—Waco 2007, no pet.). "Once the trial court, after evaluating all the evidence, has made its determination as to the amount of the child support obligation, that ruling will not be disturbed absent a clear abuse of discretion." *Reyes v. Reyes*, 946 S.W.2d 627, 629 (Tex. App.—Waco 1997, no pet.) (citing *Worford*, 801 S.W.2d at 109; *Wilemon v. Wilemon*, 930 S.W.2d 290, 293 (Tex. App.—Waco 1996, no writ)).

A parent has "the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education[.]" Tex. Fam. Code Ann. § 151.001(a)(3). The paramount concern in ordering child support is the best interest of the child. *See Thomas v. Thomas*, 895 S.W.2d 895, 897 (Tex. App.—

25

Waco 1995, writ denied). The Legislature has outlined seventeen non-exhaustive

factors for courts to consider when determining a child support award, but Appellant

does not argue that the trial court misapplied the factors provided in section 154.123

of the Family Code.[5] *See* Tex. Fam. Code Ann. § 154.123(b). Rather, Appellant

---

[5] Section 154.123 of the Family Code provides that courts should consider the following factors when awarding child support:

(1) the age and needs of the child;

(2) the ability of the parents to contribute to the support of the child;

(3) any financial resources available for the support of the child;

(4) the amount of time of possession of and access to a child;

(5) the amount of the obligee's net resources, including the earning potential of the obligee if the actual income of the obligee is significantly less than what the obligee could earn because the obligee is intentionally unemployed or underemployed and including an increase or decrease in the income of the obligee or income that may be attributed to the property and assets of the obligee;

(6) child care expenses incurred by either party in order to maintain gainful employment;

(7) whether either party has the managing conservatorship or actual physical custody of another child;

(8) the amount of alimony or spousal maintenance actually and currently being paid or received by a party;

(9) the expenses for a son or daughter for education beyond secondary school;

(10) whether the obligor or obligee has an automobile, housing, or other benefits furnished by his or her employer, another person, or a business entity;

(11) the amount of other deductions from the wage or salary income and from other compensation for personal services of the parties;

(12) provision for health care insurance and payment of uninsured medical expenses;

(13) special or extraordinary educational, health care, or other expenses of the parties or of the child;

(14) the cost of travel in order to exercise possession of and access to a child;

26

argues that Konnor's statement that he did not want child support from Ariana was "binding" on the court. We disagree. In this case, the trial court concluded that it was in the best interest of the child for Konnor to have the exclusive right to receive child support and for Ariana to pay Konnor $200 per month in child support, an amount the court stated, "is less than the amount the Texas Child Support Guidelines would mandate." Even assuming without deciding that Konnor's statement that he did not wish to receive child support from Ariana was an admission from Konnor, the trial court could have disbelieved Konnor's testimony on that issue and also could reasonably have determined that such a wish was not in Heather's best interest, after considering the factors in section 154.123(b) and all the evidence at trial. *See id*. We cannot say that Appellant has shown a clear abuse of discretion by the trial court, and we overrule her third issue. *See Reyes*, 946 S.W.2d at 629.

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

---

(15) positive or negative cash flow from any real and personal property and assets, including a business and investments;
(16) debts or debt service assumed by either party; and
(17) any other reason consistent with the best interest of the child, taking into consideration the circumstances of the parents.

Tex. Fam. Code Ann. § 154.123(b).

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on November 30, 2021
Opinion Delivered March 10, 2022

Before Kreger, Horton and Johnson, JJ.